**FILED**

MAR 21 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No.  12-14791-B-7 |
| Donis R. Zaldana, and Monica Zaldana, | ) ) ) | |
| Debtors. | ) ) | |
| First National Bank of Omaha, | ) | Adv. No. 12-01144 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Monica Zaldana, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM DECISION ON MOTION FOR
ENTRY OF DEFAULT JUDGMENT REGARDING
NONDISCHARGEABILITY OF CREDIT CARD DEBT**

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP R. 8013-1.

Before the court is a motion for entry of a default judgment by First National Bank of Omaha, a creditor and plaintiff in this proceeding (the "Bank"). The Bank contends that the debtor and defendant Monica Zaldana ("Monica" or the "Debtor") incurred three charges on her credit card account with the Bank with the intent to defraud and that the resulting debt should therefore be excepted

1  from her discharge pursuant to 11 U.S.C. § 523(a)(2)(A) or § 523(a)(2)(C).[1]  In

2  support of its motion, the Bank has attached its prior complaint and some

3  documentary evidence in the form of monthly billing statements and three

4  canceled checks.  However, the well-pled facts which the court can accept in the

5  complaint, considered in light of the documentary evidence which was offered in

6  support of the motion, still do not establish the elements of actual fraud as to the

7  three disputed transactions.  For the reasons set forth below, the Bank's motion

8  will be denied, and its complaint will be dismissed.

9          This memorandum decision contains the court's findings of fact and

10  conclusions of law required by Federal Rule of Civil Procedure 52(a), made

11  applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure

12  7052.  The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334,

13  11 U.S.C. § 523, and General Order Nos. 182 and 330 of the U.S. District Court

14  for the Eastern District of California.  This is a core proceeding as defined in 28

15  U.S.C. § 157(b)(2)(I).

16  **BACKGROUND AND FINDINGS OF FACT.**

17          The debtors Donis and Monica Zaldana, husband and wife (the

18  "Zaldanas"), filed a joint petition under chapter 7 on May 26, 2012.[2]  Based on

19  the schedules and other documents filed by the Zaldanas, Monica has worked as a

20  food service worker at a high school for five years, earning $1,616.28 in monthly

21  income.  Although Donis stated that he was a self-employed restaurant worker,

22

23          [1] Unless otherwise indicated, all chapter, section, and rule references are to the
    Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy
24  Procedure, Rules 1001–9037, as enacted and promulgated *after* October 17, 2005, the
    effective date of the Bankruptcy Abuse Prevention & Consumer Protection Act of 2005
25  (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (enacted Apr. 20, 2005).

26          [2] It is alleged in the complaint, based on the record in the case, that the Zaldanas
    obtained their prebankruptcy counseling on April 20, 2012, and paid their bankruptcy
27  attorney on May 23, 2012.

28

he was deriving no income from that position and instead had been receiving $1,950 in monthly "unemployment compensation" since 2011.[3]  According to Schedule I, the Zaldanas' combined monthly income was $3,566.28.  With $3,537.90 in monthly expenses as provided in Schedule J, the Zaldana household had a monthly net income of only $28.38.

In 2010, the Zaldanas had a combined annual income of $68,251.  The following year, their annual income dropped to $46,006 due to Donis losing his job.  Nevertheless, Monica's own annual income slightly improved from 2010 to 2011.  Specifically, she earned an income of $24,737 in 2010 (from working two jobs) and then $27,106 in 2011 (from working only one).

On Schedule F, the Zaldanas listed sixteen separate unsecured debts, which totaled $81,900.55.  Most of these debts appear to be related to credit cards.  Fourteen of these debts in the aggregate amount of $51,721.51 were identified as Monica's own.  The specific debt at issue in this proceeding relates to a credit card balance owed to the Bank in the amount of $9,500 (the "Credit Card Account" or "Account").  The debt arises from three convenience checks used by Monica in November 2011, which were then charged to her Credit Card Account.

The Credit Card Account.  In August 2010, the Bank issued a credit card to Monica with an approved credit limit of $10,500 and cash limit of $2,100.  It appears from the monthly statements that the Bank made an introductory offer to Monica to transfer balances from other credit cards to her Credit Card Account, after which the transferred balance would enjoy a 0% interest rate for a few months.  This promotional interest rate was in contrast to the standard interest

---

[3] A comment on Schedule I indicated that the "unemployment compensation" ended on May 5, 2012.

3

1  rate on the Credit Card Account of 13.99% (and 25.24% for cash advances).

2  Sometime before May 2011, Monica took advantage of this introductory offer

3  and transferred a credit card balance of more than $2,000 to her Account with the

4  Bank.[4]  This balance transfer enjoyed the 0% interest rate until September 2011

5  when the interest rate went back up to 13.99%.

6      From the time Monica made the initial balance transfer until she used the

7  first convenience check in November 2011, she did not make any additional

8  charges to the Credit Card Account.  She did make regular monthly payments to

9  the Bank, which were always equal to or slightly above the required minimum

10  payment amount.  The monthly payments were applied to reduce the balance due

11  on the 0% "Intro Bal Trans."

12      Around July 2011, the Bank made an unsolicited change to the Credit

13  Card Account by raising Monica's credit limit from $10,500 to $12,100.[5]  There

14  was no evidence presented by the Bank to suggest that Monica actually requested

15  an increase in the credit limit for her Account, or that she submitted any

16  additional financial information to the Bank in connection therewith.

17      The Convenience Checks.  At some point in mid-2011, in an effort to

18  attract Monica's business, the Bank mailed to her unsolicited convenience

19  checks, which carried a short expiration date and a low, promotional interest rate

20

21

22      [4] The precise amount and timing of this balance transfer are unknown.  Although
   the Account was opened in August 2010, the first billing statement offered into
23  evidence by the Bank was for May 2011.  It showed an existing $2,334.78 balance
   labeled as "Intro Bal Trans" with a 0% interest rate.

24

25      [5] The July 2011 billing statement provided the following message to the Debtor:

26      CONGRATULATIONS!  We have raised your credit limit.  Your new
   credit limit is $12,100.00.  Your cash limit is $2,100.00.  Your cash limit
27      is the part of your total credit limit that can be used for cash type
   transactions.  You can still use your total credit limit for purchases.

28                                 4

of 6.99%.[6]  The Debtor used three of these convenience checks in November of 2011.[7]  On the November and December statements, the Bank designated each of these transactions as a "balance transfer" or "BT special."  However, it appears from the convenience checks themselves that one check was used as a payment for goods or services to a third party while the other two were used for cash advances payable to Monica.

The first convenience check, dated November 10, 2011, was made payable to an individual named "Rocio Garcia" in the amount of $3,000.  This transaction was noted as a "payment" on the "memo" line of the check (the "Payment Transaction").  The record is silent as to what this "payment" actually represents.

The next day, Monica used the second convenience check, which she made payable to herself for $2,000.[8]  There was no evidence to show how she used the money.  Several days later, on November 29, Monica executed the third convenience check in the amount of $4,500.[9]  Again, the check was made payable to herself, but a notation on the check says "bills."  Monica was the recipient of the funds from these two convenience checks, effectively characterizing the two transactions as cash advances (the "Cash Advance Transactions").

---

[6] The Bank offered copies of the convenience checks into evidence, but it did not produce copies of the cover letters and promotional literature that accompanied the convenience checks.  The promotional interest rate is reflected on the monthly statements.

[7] Since the first two checks were identified in the billing statements as "Oct11 BT Special," they were likely given to the Debtor sometime in October 2011, and they expired on December 31, 2011.  It appears that the Debtor received the third convenience check in November 2011, because it expired on January 30, 2012.

[8] Although the second check was dated after the first, the second check was posted to the Debtor's Account earlier than the first.

[9] At the time the Debtor used the third convenience check, the balance on the Credit Card Account was $7,101.76.

5

On November 10, 2011, the same day that the first convenience check was dated, Monica made her last monthly payment to the Bank. Specifically, she made the $45 minimum payment, which was scheduled as due on November 16. As mentioned above, until this month, the Credit Card Account had never been in default. Monica always paid at least the minimum amount required each month.

According to the November 2011 billing statement, the next minimum payment was due on December 16 in the amount of $142. However, Monica did not make this payment. In response, the Bank immediately suspended the Credit Card Account, with the following notice in the December 2011 billing statement:

> Your account is past due. If your account is not already closed, your ability to use this account has been suspended. Please submit a payment by return mail.

The following month, the Bank closed the Account, but it continued to send billing statements until the bankruptcy petition was filed. By the petition date, the outstanding balance on the Credit Card Account had increased to $12,289.56. This included the remaining balance due on the initial balance transfer, the three new convenience check transactions, finance charges, late fees, and interest.

**ISSUE PRESENTED.**

"Credit card" dischargeability complaints are frequently filed in the bankruptcy courts. The debtor-defendants often do not respond for economic reasons or otherwise, in which case, the "dischargeability" question ultimately comes before the court, as here, in the form of a motion for entry of a default judgment. The fundamental issue presented here is whether the Bank has made an adequate showing based on well-pleaded facts in the complaint and any supporting evidence that the Debtor's use of the three convenience checks constituted actual fraud within the meaning of § 523(a)(2)(A).

/ / /

6

**DISCUSSION AND CONCLUSIONS OF LAW.**

Judgement by Default. Default judgments are governed by Federal Rule of Civil Procedure 55, which is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7055. The entry of a default judgment in an adversary proceeding is a two-step process, requiring (1) the entry of the party's default, and then (2) the entry of a default judgment. *See* Fed. R. Civ. P. 55(a), (b); *Brooks v. United States*, 29 F. Supp. 2d 613, 618 (N.D. Cal.), *aff'd*, 162 F.3d 1167 (9th Cir. 1998) (unpublished table decision).[10]

The bankruptcy court is given broad discretion to enter a default judgment in an adversary proceeding; however, the plaintiff is not entitled to such judgment as a matter of right. *Cashco Fin. Servs., Inc. v. McGee (In re McGee)*, 359 B.R. 764, 771 (9th Cir. BAP 2006) (citing *Kubick v. FDIC (In re Kubick)*, 171 B.R. 658, 659–60 (9th Cir. BAP 1994)). The court is permitted, but is not required, to draw inferences in a default judgment context. "In order to do justice, a trial court has broad discretion to require that a plaintiff prove up even a purported *prima facie* case by requiring the plaintiff to establish the facts necessary to determine whether a valid claim exists that would support relief against the defaulting party." *Id.* at 773 (emphasis omitted) (citing *Wells Fargo Bank v. Beltran (In re Beltran)*, 182 B.R. 820, 823 (9th Cir. BAP 1995) (noting that entry of default does not automatically entitle plaintiff to default judgment, regardless of general effect of entry of default that deems well-founded allegations as admitted); *Quarré v. Saylor (In re Saylor)*, 178 B.R. 209, 212 (9th Cir. BAP 1995) (finding no abuse of discretion by trial court in denying entry of

---

[10] The Debtor failed to respond to the complaint and her default was entered on December 12, 2012.

7

1  default judgment after trial court directed plaintiff to submit evidence of a *prima*
2  *facie* case in support of default judgment), *aff'd*, 108 F.3d 219 (9th Cir. 2007)).

3        The court's analysis of any adversary proceeding that culminates in the
4  entry of a judgment by default should begin with the pleadings. *See id.* at 771
5  (noting that one factor considered for entry of default judgment is "the
6  sufficiency of the complaint"). Pursuant to Federal Rule of Civil Procedure 8, a
7  pleading, such as a complaint, must state a "short and plain statement of the claim
8  showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2),
9  *incorporated by* Fed. R. Bankr. P. 7008. A complaint alleging fraud must plead
10  the circumstances constituting the fraud "with particularity." Fed. R. Civ. P.
11  9(b), *incorporated by* Fed. R. Bankr. P. 7009.

12        The plaintiff's duty to show its "'entitle[ment] to relief' requires more
13  than labels and conclusions, and a formulaic recitation of the elements of a cause
14  of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
15  The court has an affirmative obligation to review the underlying factual
16  allegations and supporting evidence to make sure the plaintiff has pleaded and
17  can prove its *prima facie* case. In light of the new heightened pleading standard
18  established by the Supreme Court in *Twombly*, 550 U.S. 544, and *Ashcroft v.*
19  *Iqbal*, 556 U.S. 662 (2009), the plaintiff must plead more than a recitation of the
20  underlying statute with the mere possibility of damages. The bankruptcy court
21  cannot accept as true any legal conclusions couched as factual allegations. *See*
22  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

23        The potential for abuse in the filing of dischargeability complaints,
24  coupled with the more rigid pleading standards applicable to fraud claims,
25  underscores the importance of judicial scrutiny of both the complaint and the
26  ensuing default proceedings, filed against debtors who often cannot defend
27  themselves. *See AT&T Universal Card Servs. Corp. v. Grayson (In re Grayson)*,
28

8

1  199 B.R. 397, 403 (Bankr. W.D. Mo. 1996).  The tension here was thoughtfully

2  considered by one court in a recent unpublished opinion:

> A debtor who files leaves all non-exempt assets with a trustee, and
> seeks to emerge with only his future income, his exempt assets, and
> a discharge from personal liability.  If that debtor is sued by a
> creditor claiming its debt cannot be discharged, the choice is either
> to fight the charge, though lacking the resources to pay a lawyer to
> do so, or simply to settle with the creditor, often agreeing to
> reaffirm the debt.  And this is motivated often by the simple fact
> that the debtor cannot afford the fight—never mind whether the
> allegations are well taken or not.  It is thus important to apply the
> *Twombly* standard rigorously to these sorts of complaints.  Indeed,
> if anything, the more rigorous pleading standards applicable to
> fraud actions makes this scrutiny even more important.

*FIA Card Servs. v. Travis (In re Travis)*, No. 10-5118-C, 2011 WL 1334387, at
*2 (Bankr. W.D. Tex. Apr. 7, 2011) (citing *In re Grayson*, 199 B.R. at 403).

11      The court must therefore scrutinize the Bank's complaint and the

12  supporting documentary evidence to determine whether it has proven its *prima*

13  *facie* case under § 523(a)(2)(A).

14      The "Fraud" Exception to Discharge Under § 523(a)(2)(A).  To balance

15  the fresh start afforded to "honest but unfortunate" debtors through a discharge of

16  debts, the Bankruptcy Code excepts from discharge any debt "for money,

17  property, services, or an extension, renewal, or refinancing of credit, to the extent

18  obtained by . . . false pretenses, a false representation, or *actual fraud*."

19  § 523(a)(2)(A) (emphasis added).  To prove actual fraud, a creditor must

20  establish each of the following five elements: (1) that the debtor made false

21  representations; (2) that at the time he knew they were false; (3) that he made

22  them with the intention and purpose of deceiving the creditor; (4) that the creditor

23  relied on such representations; and (5) that the creditor sustained the alleged loss

24  and damage as the proximate result of the representations having been made.

25  *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir.

26  1996).  These five elements mirror those of common law fraud.  *See Field v*

27  *Mans*, 516 U.S. 59, 69 (1995).  In the nondischargeability action, the creditor

9

must prove these elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991).

For some consumer debts, the nondischargeabililty question is settled by a statutory, but rebuttable, presumption. "[C]onsumer debts owed to a single creditor and aggregating more than $600 for luxury goods or services incurred by an individual debtor on or within 90 days before [the commencement of the bankruptcy] are presumed to be nondischargeable." § 523(a)(2)(C)(i)(I). Some cash advances from a credit card may also be declared nondischargeable by a rebuttable presumption. Specifically, "cash advances aggregating more than $875 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before [the commencement of the bankruptcy] are presumed to be nondischargeable." § 523(a)(2)(C)(i)(II).

Here, the Bank seeks a determination that the Debtor's use of the convenience checks in November 2011 was done with fraud. However, none of the transactions at issue here fall within the presumption periods prescribed in § 523(a)(2)(C), since they occurred roughly six months before the petition date. The court must therefore determine whether fraud has been established through the common-law elements.

Dischargeability of a Credit Card Debt. When the debt at issue arises from the use of a credit card, the first, fourth, and fifth elements of the fraud claim under § 523(a)(2)(A) are generally straightforward. As to the first element, courts accept the premise that the debtor's use of a credit card constitutes a representation to the creditor of the debtor's intent to repay the debt. *Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996). For the fourth element, a creditor's reliance on the debtor's representation need only be justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A). *See Field*, 516 U.S. at 74–75. In the credit card context, unless the debtor's credit

card history is marked by "red flags," the creditor can establish reliance on the debtor's promise to pay the debt by simply showing that the debtor paid his or her credit card debts in the past. *See In re Eashai*, 87 F.3d at 1091. As to the fifth element, the finding of damages is supported by the fact that the debt was not repaid and is subject to potential discharge in the bankruptcy proceeding.

In a credit card dischargeability case, the issues shift away from the actual representation and focus more on the debtor's state of mind: Knowledge that the representation was false and the intent to defraud. With respect to credit card debt, the Ninth Circuit Bankruptcy Appellate Panel has noted,

> Where purchases are made through the use of a credit card with no intention at that time to repay the debt, that debt must be held to be nondischargeable pursuant to section 523(a)(2)(A). To hold otherwise would be to ignore the plain language of the statute and to reward dishonest debtors.

*Citibank S.D., N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988) (quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 753–54 (Bankr. N.D. Ind. 1986)) (internal quotation marks omitted), *abrogated on other grounds by Grogan*, 498 U.S. 279.

In *In re Dougherty*, the court adopted a nonexclusive list of twelve objective factors that "trial courts should consider" to determine the debtor's intent.[11] *Id.* However, "[t]hese factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent." *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1997); *see also Household Credit Servs., Inc. v. Ettell*

---

[11] The twelve *Dougherty* factors are: (1) The length of time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges are made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) financial sophistication of the debtor;(11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities. 84 B.R. at 657 (citation omitted).

11

*(In re Ettell)*, 188 F.3d 1141, 1145 (9th Cir. 1999) ("*Dougherty* does not handcuff the trier of fact, who is in the best position to balance the objective evidence against the witness's testimony and credibility.  Totality of the circumstances means totality of the circumstances.").

Rather, "[s]o long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." *In re Hashemi*, 104 F.3d at 1125 (citing *Grogan*, 498 U.S. at 291).  Nevertheless, "the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt." *In re Anastas*, 94 F.3d at 1286.

The Ninth Circuit has since adopted the *Dougherty* approach for determining if the debtor used his or her credit card with a subjective intent to deceive.  "Since a debtor will rarely admit to his fraudulent intentions, the creditor must rely on the twelve factors of *Dougherty* to establish the subjective intent of the debtor through circumstantial evidence." *In re Eashai*, 87 F.3d at 1090.

The Ninth Circuit has described the *Dougherty* approach as a "totality of the circumstances" analysis and has stated, "Under this theory, a court may infer the existence of the debtor's intent not to pay if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor." *Id.* at 1087. Applying the elements of actual fraud to the situation of a credit card debt, the Ninth Circuit developed three essential inquiries: (1) did the card holder fraudulently fail to disclose his intent not to repay the credit card debt; (2) did the card issuer justifiably rely on a representation by the debtor; and (3) was the debt sought to be discharged proximately caused by the first two elements. *In re Anastas*, 94 F.3d at 1284 (citing *In re Eashai*, 87 F.3d at 1088).

12

1    In *In re Anastas*, the Ninth Circuit clarified that financial condition,

2  *standing alone*, is not a substitute for an actual finding that the debtor intended to

3  deceive the creditor when the charges were incurred. *Id.* at 1286. For this

4  reason, the court explained in *Anastas* that a trial court must not singularly focus

5  on the debtor's ability to repay the debts but on whether the debtor incurred the

6  debts with an intent not to repay. *Id.* at 1285. The *Anastas* court further clarified

7  that the "intent not to repay" inquiry must generally be applied to each individual

8  charge made to the credit card. *See id.* In that case, the court viewed each

9  individual credit transaction as the formation of a unilateral contract, in which the

10  card holder promises to repay the debt plus accrued finance charges and the card

11  issuer performs by reimbursing the merchant who accepted the credit card in

12  payment. *Id.*

13    In many credit card cases the inquiry is not whether the card holder
      lacked an intent to repay *all* of the charges made on the card
14    because of a fraudulent financial scheme, but rather whether the
      card holder lacked an intent to repay when making certain
15    *individual* charges because he planned to shortly discharge them in
      bankruptcy. This behavior is commonly referred to as "loading
16    up."

17  *Id.* (emphasis in original).

18    Fraudulent Use of the Convenience Checks. In this case, the Debtor used

19  convenience checks, not the credit card, for the three transactions in question.

20  Convenience checks are distinguishable from credit cards in several ways. First,

21  the convenience checks were initiated by the Bank, the evidence does not show

22  that they were solicited by the Debtor. Unlike credit cards, which typically carry

23  a very high interest rate, convenience checks are actively promoted with financial

24  enticements, principally a very low interest rate and a short expiration date, for no

25  purpose other than to encourage their use. Because the use of a convenience

26  check presents a somewhat different factual scenario than the use of a credit card,

27

28                                              13

1  the court must first determine whether the modified *Eashai/Anastas* test for credit

2  card debt is still applicable to convenience checks.

3        In *Turtle Rock Meadows Homeowners Association v. Slyman (In re*

4  *Slyman)*, the Ninth Circuit summarized the structure of a credit card transaction

5  by comparing it to the relationship of the parties in a different type of transaction:

6        [H]omeowner/homeowners association transactions do not bear the
distinguishing characteristic of card holder/credit card company

7        transactions. *Transactions between a credit card holder and a
credit card company are intermediated by a third-party vendor.*

8        Transactions between a homeowner and a homeowners association,
by contrast, are direct and without intermediation.

9

10  234 F.3d 1081, 1086 (9th Cir. 2000) (emphasis added).

11        In a two-party transaction, the creditor "must prove the elements of

12  misrepresentation and reliance directly." *Id.* By contrast, in a three-party

13  transaction, the creditor can "establish these two elements by reference to the

14  'totality of the circumstances.'" *Id.* (quoting *In re Eashai*, 87 F.3d at 1087–88).

15  Thus, the distinction is significant.

16        Here, the Debtor's use of convenience checks still constituted three-party

17  transactions. For the Payment Transaction, the Debtor presented the convenience

18  check to a third party intermediary, namely Rocio Garcia, who gave consideration

19  to the Debtor and then deposited the check and obtained reimbursement from the

20  Bank. The third-party relationship also applies to the two Cash Advance

21  Transactions, because the third-party recipient of the convenience checks gave

22  funds to the Debtor and then presented the checks to the Bank.

23        In both scenarios, the Bank transferred its funds to the third parties and

24  then charged those amounts to the Debtor's Credit Card Account. The Bank did

25  not transact directly with the Debtor. Therefore, the Payment Transaction and

26  Cash Advance Transactions must be analyzed under the same standard as a

27  transaction completed by credit card. The Bank has the burden to establish,

28

14

1 through the totality of the circumstances, that each separate transaction made
2 with the convenience checks was done with fraudulent intent. *In re Anastas*, 94
3 F.3d at 1285. The court will now examine the three transactions at issue.

4   Fraudulent Intent and the Convenience Check Transactions. As discussed
5 above, the first inquiry is whether the Debtor entered into these transactions
6 without any intent to repay the subject debt. *See id.* at 1284. In these cases, "the
7 central inquiry in determining whether there was a fraudulent representation is
8 whether the card holder lacked an intent to repay *at the time he made the*
9 *charge*." *Id.* at 1285 (emphasis added). Although the court must view each
10 transaction individually, all three transactions at issue here do share similar
11 circumstances which weigh both for and against a finding of fraudulent intent.
12 The court will therefore discuss the transactions together.

13   On the one hand, the court acknowledges that some of the circumstances
14 surrounding the Debtor's use of the three convenience checks may weigh in favor
15 of the Bank's case. The Debtor used the three checks within a short period of
16 time (between November 10 and 29) after a period of no activity on the Credit
17 Card Account, and each transaction was for a substantial amount of money
18 (ranging from $2,000 to $4,500). A month after the Debtor used the convenience
19 checks, she stopped making payments to the Bank. Finally, the Debtor
20 apparently had outstanding balances with other credit card issuers in the range of
21 $50,000 around the time she used the three convenience checks. These
22 circumstances could tend to suggest that the Debtor acted with the intent not to
23 repay her debt to the Bank.

24   On the other hand, there are numerous circumstances and unanswered
25 questions surrounding the use of the three convenience checks that mitigate in the
26 Debtor's favor and which are inconsistent with the argument that the Debtor did
27 not intend to repay her debts. First, the fact that she made the minimum monthly

28

payment in November 2011, the same month in which she used the convenience checks, strains the argument that she also intended to file bankruptcy after using the convenience checks. If she was then intending to file bankruptcy, why would she waste the money for the monthly payment? Second, the fact that the Debtor stopped using the Credit Card Account all together approximately five months before she obtained her prepetition credit counseling, and six months before she filed her bankruptcy petition, shows that she did not "load up" the Credit Card Account with new debt on the eve of bankruptcy.

Third, the court must ask, what was the purpose behind using the convenience checks and taking advantage of the low, promotional interest rate if the Debtor was already intending to file bankruptcy? The disparate financial consequences between the regular 13.99% interest rate (or 25.24% rate for cash advances) versus the promotional 6.99% interest rate would mean little to someone who was intending to file bankruptcy.[12] However, for someone who was attempting to better handle her debt levels, the difference is significant.

Additionally, the Bank's promotion of unsolicited convenience checks to the Debtor, at a time when the Debtor may not have been in the best financial situation, is another circumstance that the court must consider. Nothing in the record suggests that the Debtor requested the convenience checks from the Bank. The Debtor had not used the credit card for months before the Bank sent the promotional convenience checks. The Bank offered these checks to the Debtor and encouraged their immediate use with an attractive, low interest rate and a short expiration date. The Bank not only enticed the Debtor with more

---

[12] The Debtor could have used her credit card to obtain the $2,000 cash advance since her cash limit was $2,100. If she had done so, the interest rate would have been 25.24%. Since she used a convenience check instead, the applicable interest rate was only 6.99%.

16

1  opportunities to spend money with the convenience checks, but it also
2  preemptively increased the Debtor's credit limit so that she could do so. The
3  Debtor, being relatively unsophisticated, accepted the Bank's "generous" offer.
4  The Debtor did exactly what the Bank encouraged her to do with the convenience
5  checks. On balance, these circumstances outweigh the "negative" circumstances
6  discussed above.

7      Whenever a credit card issuer provides unsolicited convenience checks to
8  a debtor with aggressive promotional enticements to encourage immediate use of
9  such checks, such as the lure of a teaser interest rate, it will be much more
10  difficult to prove the requisite fraudulent intent based on the "circumstances."
11  When the debtor accepts that seemingly irresistible offer, she only does exactly
12  what the credit card issuer requested. Based on the totality of the circumstances
13  as alleged in the complaint and inferred from the documentary evidence, the court
14  is not persuaded that the Debtor used the Bank's convenience checks with the
15  actual intent not to repay the resulting debt.

16      Justifiable Reliance and the Cash Advance Transaction. Although the
17  court has already determined that the Debtor acted without fraudulent intent for
18  all three transactions, the court cannot find that there was justifiable reliance on
19  the Bank's part as to the $4,500, second Cash Advance Transaction. This second
20  Cash Advance was only possible because the Bank had unilaterally raised the
21  Debtor's credit limit from $10,500 to $12,100. What did the Bank rely upon
22  when it raised the credit limit and subsequently authorized the $4,500 Cash
23  Advance Transaction? The Bank does not address this issue in its motion.

24      The Supreme Court has held that a creditor's reliance on a debtor's
25  representation of intent to repay a debt must only be justifiable, rather than
26  reasonable, to except the debt from discharge under § 523(a)(2)(A). *Field*, 516
27  U.S. at 74–75. The standard for "justifiable reliance" under § 523(a)(2)(A) is

28

derived from the standard applied to the common law tort of fraud. *See id.* at 70.
In *Field*, the Court looked to the Restatement (Second) of Torts to define that
term. *Id.* Unlike an objective standard of reasonableness, "'[j]ustification is a
matter of the qualities and characteristics of the particular plaintiff, and the
circumstances of the particular case, rather than of the application of a
community standard of conduct to all cases.'" *Id.* at 71 (quoting Restatement
(Second) of Torts § 545A, cmt. b (1976)). This court must therefore determine
whether the Bank's reliance was justifiable based on an "'individual standard of
[the Bank's] own capacity and the knowledge which [it] has, or which may fairly
be charged against [it] from the facts within [its] observations in the light of [its]
individual case.'" *Id.* at 72 (quoting W. Prosser, Law of Torts § 108, at 717 (4th
ed. 1971)).

     "Justifiability is not without some limits, however." *Id.* at 71. "[A]
person cannot rely upon a representation if 'he knows that it is false or its falsity
is obvious to him.'" *Eugene Parks Law Corp. Defined Benefit Pension Plan v.
Kirsh (In re Kirsh)*, 973 F.2d 1454, 1458 (9th Cir. 1992) (quoting Restatement
(Second) of Torts § 541). Rather, a person is "'required to use his senses, and
cannot recover if he blindly relies upon a misrepresentation the falsity of which
would be patent to him if he had utilized his opportunity to make a cursory
examination or investigation.'" *Field*, 516 U.S. at 71 (quoting Restatement
(Second) of Torts § 541, cmt. a). "'In sum, although a person ordinarily has no
duty to investigate the truth of a representation, a person cannot purport to rely on
preposterous representations or close his eyes to avoid discovery of the truth.'"
*In re Eashai*, 87 F.3d at 1090–91 (quoting *Romesh Japra, M.D., F.A.C.C., Inc. v.
Apte (In re Apte)*, 180 B.R. 223, 229 (9th Cir. BAP 1995)).

     Typically, in a credit card case under § 523(a)(2)(A), "the credit card
issuer justifiably relies on a representation of intent to repay as long as the

18

account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable." *In re Anastas*, 94 F.3d at 1286 (citing *In re Eashai*, 87 F.3d at 1091). But "[i]f the creditor had warning that the debtor's account was *in danger of default*, the creditor will not be able to establish justifiable reliance." *In re Eashai*, 87 F.3d at 1091 (emphasis added).

Here, the Debtor did not miss a payment to the Bank until December 2011, after she had used the convenience checks. This was apparently the first default on the Account and arguably, until that date, the Bank had no "warning" that the Debtor might not fulfill her financial commitments to the Bank. However, there were other surrounding facts and circumstances—which should have been apparent to the Bank—that raise serious questions about its "justifiable reliance." Ironically, many of these circumstances involve the same arguments the Bank makes against the Debtor. If, as the Bank alleges in the compliant, the Debtor was in such poor financial condition in November 2011, that the court could infer fraudulent intent when she used the convenience checks, then what was the Bank relying on four months earlier, in July 2011, when it increased the credit limit on the Credit Card Account?

To the extent the Bank could justifiably rely on the Debtor's credit activity, its reliance was limited to any debts incurred that fell below the prior $10,500 credit limit. That was the original credit limit on the Debtor's Account, and the Debtor had not missed a payment, whenever due, when her credit limit was at this level. Arguably, the Bank could justifiably believe that the Debtor could manage the debt when her credit limit was $10,500. *Cf. In re Eashai*, 87 F.3d at 1091 ("In some instances, the creditor may *initially* rely on the debtor's credit report (before issuing the credit card) which shows that the debtor has a history of servicing his credit card debt in a timely manner." (emphasis added)).

19

However, the Bank, without any reasonable explanation or justification, increased that credit limit from $10,500 to $12,100 in July of 2011. The Debtor did not request the increase, and she was not even using her Credit Card Account at that time. By increasing the credit limit, the Bank essentially gave the Debtor a new, pre-approved credit card with a $1,600 limit, totally unsolicited by the Debtor and without any sort of evaluation of the Debtor's current creditworthiness. Now, the Bank claims it is the innocent victim of a fraud, who justifiably relied on an implied representation that the Debtor would repay the additional debts (i.e., the debts incurred above the prior credit limit). However, the additional debt, attributable here to the second Cash Advance Transaction,[13] was only made possible due to the Bank's decision to unilaterally increase the credit limit without investigation. But as one bankruptcy court has opined,

> As the more sophisticated party in financial relationships with nearly every consumer, credit card issuers may not stick their heads in the sand for long periods and still claim justifiable reliance when they now have the tools to see a debtor's actual financial situation and they are already closely watching.

*FIA Card Servs. v. Finnerty (In re Finnerty)*, 418 B.R. 1, 11 (Bankr. D.N.H. 2009); *see also In re Kirsh*, 973 F.2d at 1458 ("[I]f a person does have 'special knowledge, experience and competence' he may not be permitted to rely on representations that an ordinary person would properly accept." (quoting W. Page Keeton et. al., Prosser and Keeton on the Law of Torts § 108, at 751 (5th ed. 1984))).

The Bank, as a credit card issuer, cannot justifiably make more credit available to the Debtor and then complain because it did not get paid, when the Bank did nothing to evaluate the Debtor's current ability to repay such additional debts. "[C]redit card issuers have an obligation to perform at least minimal investigation into a card [holder's] financial situation before . . . *increasing*

---

[13] At the time of the $4,500 Cash Advance Transaction, the Debtor's balance on the Account was already $7,101.76. Thus, if the original credit limit of $10,500 was still applicable, this transaction would have exceeded that limit.

1   *credit*; otherwise, it will be difficult to find that a credit card issuer relied on
2   anything when extending credit." *Compass Bank v. Meyer (In re Meyer)*, 296
3   B.R. 849, 863 (Bankr. N.D. Ala. 2003) (emphasis added); *see also In re Eashai*,
4   87 F.3d at 1091 ("We will not allow a creditor, who has been put on notice of the
5   debtor's intent not to repay, to extend credit and then later claim
6   nondischargeability on the basis of fraud."). Because the Bank failed to perform
7   any kind of cursory investigation prior to raising the Debtor's credit limit, the
8   Bank could not have justifiably relied on the Debtor's implied representation that
9   she would, or could, repay the $4,500 Cash Advance, which was made possible
10  only by the Bank's decision to increase the limit on the Account in the first place.
11          Additionally, a "red flag" should have waved in front of the Bank when
12  the Debtor sought the second Cash Advance Transaction. With the first Cash
13  Advance Transaction for $2,000 already approved and a cash limit on the
14  Account of only $2,100, the new outstanding cash balance after the second Cash
15  Advance Transaction clearly exceeded this $2,100 limit. The Bank therefore
16  should have declined to approve the transaction. The Bank cannot have any
17  justifiable reliance when it fails to enforce its own limitations on a credit card
18  holder's account.
19  **CONCLUSION.**
20          Based on the foregoing, the Bank has not sustained its burden to show,
21  through well-pled facts in the complaint and the supporting documentation, that
22  the Debtor had the requisite fraudulent intent when she used the three
23  convenience checks. With regards to the second Cash Advance Transaction, the
24  / / /
25  / / /
26  / / /
27
28
                                        21

1  court is not persuaded that the Bank justifiably relied on any "implied
2  representation" when it approved the transaction in the first place.  Accordingly,
3  the Bank's motion for entry of a default judgment will be denied, and the
4  complaint will be dismissed.
5        Dated: March  _2/_ , 2013

        W. Richard Lee
        United States Bankruptcy Judge

Donis R. & Monica Zaldana, Case No. 12-14791-B-7/Adv. Proc. No. 12-1144

Donis R. Zaldana
Monica Zaldana
11717 Cactus Flower Avenue
Bakersfield, CA 93311

Steven M. Stanley, Esq.
Attorney at Law
1801 Oak St., #151
Bakersfield, CA 93301

Donald T. Dunning, Esq.
Attorney at Law
4545 Murphy Canyon Rd., #200
San Diego, CA 92123

Randell Parker
Chapter 7 Trustee
3820 Herring Rd.
Bakersfield, CA 93203

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare St., Ste. 1401
Fresno, CA 93721